UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FABIAN SANTIAGO, ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> KAREN RABIDEAU, et al., ) <br> ) <br> **Defendants.** ) | No. 15 C 1856 <br><br> Chief Judge Rubén Castillo |

## MEMORANDUM OPINION AND ORDER

Fabian Santiago ("Plaintiff"), a prisoner incarcerated at Stateville Correctional Center ("Stateville"), brings his second amended complaint against Karen Rabideau, Leslie Turner, Mindi Pierce, Clarence D. Wright, Colleen M. Franklin, Daniel Reed, Christopher Williams, Tarry Williams, and John Does 1 through 10 (collectively, "Defendants"), employees of the Illinois Department of Corrections ("IDOC") at Stateville. (R. 28, Second Am. Compl.) Plaintiff brings this action pursuant to 42 U.S.C. § 1983 alleging deprivations of his rights under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution. (*Id.*) Presently before the Court is Plaintiff's motion for summary judgment on his First Amendment claim. (R. 60, Mot.) For the reasons stated below, Plaintiff's motion is granted in part and denied in part.

## RELEVANT FACTS

The following facts are undisputed. For the past ten years, Plaintiff has been incarcerated at Stateville. (R. 67, Defs.' Resp. to Pl.'s Facts ¶ 2.) In July 2014, an inmate who was classified as an "escape risk" was transferred to Plaintiff's cell. (*Id.* ¶ 8.) Because Plaintiff's cellmate was deemed an escape risk, their cell was subject to more frequent searches. (*Id.*) In August 2014, Plaintiff wrote a letter to then Illinois Governor Patrick J. Quinn regarding his cellmate, the

frequent searches that he was being subjected to, and his perceived lack of response by IDOC employees. (*Id.* ¶ 15; R. 61-3, Ex. C, 2014 Letter.) The letter reads, in its entirety, as follows:

8/20/2014

To: Mr. Patrick J. Quinn:

Listen to me you faggot motherfucker! I wrote your punk ass almost a month ago notifying your office of these piece of shit, corrupt prison officials deliberately having me placed into a celling [sic] location with an [inmate] categorized as an extremely high escape risk in order to justify having my cell searched every several days, completely destroying my cell, stealing my property & provoking physical confrontations between myself, my cellmate & prison guards. These are criminal acts of misconduct & your fuckin racist & corrupt office is refusing to do anything about these abuses.

I have already filed an emergency grievance dated: 8/3/14, concerning these abuses & this punk ass warden has refused to take correct action. I have every intention on filing suit in federal court and your offices [sic] roll [sic] in disregarding & concealing these abuses will be stipulated. You have allowed a cess pool [sic] of corruption & abuse against [inmates] to plague the IDOC & haven't done shit to address these matters—I can only hope you lose the election you fuckin asshole.

(R. 61-3, Ex. C, 2014 Letter.)

A copy of Plaintiff's letter to Governor Quinn was forwarded to the Stateville Investigation Unit. (R. 61-1, Ex. A, Offender Disciplinary Report.) The Offender Disciplinary Report documenting the letter listed Defendant Pierce as the reporting employee and Defendant Turner as a witness. (R. 67, Defs.' Resp. to Pl.'s Facts ¶ 16.) The Offender Disciplinary Report noted that the letter "was very disrespectful," constituted "insolence," and was a "major infraction." (R. 61-1, Ex. A, Offender Disciplinary Report.) Insolence is defined in the prison regulations as "[t]alking, touching, gesturing, or other behavior that harasses, annoys or shows disrespect." IL. ADMIN. CODE 20, § 504, Table A (2001). On September 8, 2014, Plaintiff was brought before IDOC's Adjustment Committee, composed of Defendants Wright and Franklin, on the insolence charge. (R. 67, Defs.' Resp. to Pl.'s Facts ¶¶ 18-19.) Wright and Franklin found

2

Plaintiff guilty of insolence and recommended that he be transferred to F-House, Stateville's disciplinary segregation unit, for one month. (*Id.* ¶ 26.) As a result, Plaintiff was subsequently incarcerated in F-House for one month. (*Id.*)

## PROCEDURAL BACKGROUND

On February 27, 2015, Plaintiff filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging numerous violations of his constitutional rights by Stateville officials. (R. 1, Compl.) After Plaintiff's initial complaint was dismissed without prejudice, (R. 9, Order), the Court granted Plaintiff leave to amend his subsequent complaint and also appointed counsel for him, (R. 23, Order). Plaintiff filed his second amended complaint, through counsel, on August 17, 2015. (R. 28, Second Am. Compl.)

In Count I, Plaintiff alleges that Defendants violated his rights under the First Amendment by charging him with insolence and punishing him with disciplinary segregation in connection with his letter to Governor Quinn. (*Id.* ¶¶ 36-47.) In Count II, Plaintiff alleges that Defendants violated his rights under the Fourteenth Amendment by failing to provide him with procedural due process during the IDOC hearing on the insolence charge. (*Id.* ¶¶ 48-50.) In Count III, Plaintiff alleges that the conditions he was incarcerated under during his time in disciplinary segregation constitute a violation of his rights under the Eighth Amendment to the U.S. Constitution. (*Id.* ¶¶ 52-56.) Defendants Rabideau, Turner, Pierce, Franklin, Reed, Tarry Williams, and Christopher Williams answered the amended complaint on December 18, 2015. (R. 47, Answer.) Defendant Wright filed a separate answer on March 10, 2016. (R. 57, Wright's Answer.)

Plaintiff now moves for summary judgment as to all Defendants on his First Amendment claim. (R. 60, Mot. at 1.) On May 31, 2016, Defendants filed their response, (R. 66, Resp.), and Plaintiff filed his reply on June 13, 2016, (R. 70, Reply).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute over a material fact is genuine if a reasonable jury could return a verdict for the non-moving party on the evidence presented." *Life Plan, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (internal quotation marks and citation omitted). Once the moving party has met its burden, the nonmoving party must "come forward with specific facts demonstrating that there is a genuine issue for trial." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The nonmoving party must show that there is evidence upon which a jury reasonably could find for [that party]." *Id.*

## ANALYSIS

### I. Legal Standard Regarding Outgoing Prisoner Mail

Generally, the governing standard for reviewing the constitutionality of the actions of prison officials is the one set forth in *Turner v. Safley*, 482 U.S. 78, 84 (1987)—whether the official's action was "reasonably related to legitimate penological interests." However, an alternative test was set forth in *Procunier v. Martinez*, 416 U.S. 396, 413-14 (1974), in which the Supreme Court addressed the extent to which First Amendment protections apply to prisoners' outgoing mail. Specifically, *Martinez* considered a regulation which censored outgoing inmate mail that contained "inflammatory" statements or was deemed to "magnify grievances" or "unduly complain." *Id.* at 399. In finding the regulation unconstitutional, the *Martinez* court set forth a two-part test for considering prison censorship of outgoing mail:

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

*Id.* at 413. Thus, prison administrators may place restrictions on prisoners' outgoing mail if the restrictions further the interests of order, security, or rehabilitation. *Id.* The *Martinez* test has consistently been applied only in the context of censoring outgoing inmate correspondence to nonprisoners. *See Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989) (declining to apply test to censorship of incoming publications). The Supreme Court has explained that different tests for incoming and outgoing mail are appropriate because outgoing correspondence poses a less significant security threat to prison. *Id.* at 413. Indeed, "outgoing correspondence that magnifies

5

grievances or contains inflammatory racial views cannot reasonably be expected to present a danger to the community *inside* the prison." *Id.* at 411-12. As both parties rely upon *Martinez* in their briefs, the Court will apply *Martinez* to determine whether Plaintiff's First Amendment rights were violated when he was punished for the contents of his letter.

## II. The Insolence Regulation is Constitutional.

Plaintiff contends that the insolence regulation—which prohibits "[t]alking, touching, gesturing, or other behavior that harasses, annoys or shows disrespect," ILL. ADMIN. CODE 20, § 504, Table A (2001)—is unconstitutional. (R. 60, Mot. at 6-7.) However, as Defendants point out, (R. 66, Resp. at 6), the U.S. Court of Appeals for the Seventh Circuit has previously found a similar regulation to be constitutional.

In *Ustrak v. Fairman*, 781 F.2d 573 (7th Cir. 1986), the Seventh Circuit upheld a prisoner's punishment under a similarly broad regulation prohibiting "being disrespectful" and cursing or using "any other vulgar, abusive, insolent, threatening, or improper language" toward prison employees. *Id.* at 580. The *Ustrak* court acknowledged that the statutory language was "somewhat vague and overbroad," but found that the concepts of "overbreadth" and "vagueness" in First Amendment jurisprudence had limited relevance in a prison context, "where the right of free speech is limited." *Id.* Indeed, the court emphasized that "[p]eople who want to enjoy the full panoply of constitutional rights to express themselves had best refrain from committing crimes punishable by imprisonment." *Id.* In light of these principles, the court found that the regulation—similar to the insolence regulation—did not violate the First Amendment. *Id.*

While not binding precedent, the Seventh Circuit's decision in *Carroll v. Tucker*, 17 F. App'x 392 (7th Cir. 2001), is also instructive. Relying upon the standard set forth in *Martinez*, the Seventh Circuit in *Carroll* affirmed summary judgment in favor of prison officials who

6

punished an inmate under the same insolence statute at issue in this case. In *Carroll*, the inmate wrote two letters to his wife that contained derogatory statements about an assistant warden. *Id.* at 393. After he sent the first letter, he received a disciplinary report notifying him that he was charged with insolence against a prison employee. *Id.* Following receipt of the disciplinary report, the inmate wrote a second letter to his wife. *Id.* The inmate wrote:

> Since I got a ticket for stating in one of my letters Assistant Asshole N***** Warden Hinsley I thought I would say it again. One more time: Assistant Asshole N***** Warden Hinsely. Now issue two more tickets you nosy assholes reading my mail.

*Id.* As a result of the second letter, the inmate was given another disciplinary report for insolence and subsequently disciplined for insolence. *Id.* Following his punishment, the inmate brought suit alleging that the prison officials violated his First Amendment rights by punishing him for the contents of the letters. *Id.* at 393. The Seventh Circuit determined that the language used in the letter was "insolent" and "the derogatory comments . . . are clearly directed at and meant to [be] read by prison employees." *Id.* at 394. Thus, the Court concluded that the discipline the inmate received for "violating the legitimate prohibition against insolence passes [the] constitutional standard" established by the Supreme Court in *Martinez*. *Id.* at 393.

Based on these decisions, the Court determines that the insolence regulation is constitutional. The language of the insolence regulation and the regulation found constitutional in *Ustrak* are largely similar—both prohibit the use of language or actions that are deemed disrespectful. Similar to the regulation in *Ustrak*, the insolence regulation is directed at maintaining order inside the prison and there are "few things more inimical to prison discipline than allowing prisoners to abuse guards and each other." *Ustrak*, 781 F.2d at 580. While Plaintiff argues that the insolence regulation is overbroad, (R. 60, Mot. at 6), the *Ustrak* court emphasized that concepts of "overbreadth" and "vagueness" in First Amendment jurisprudence have limited

7

relevance in the prison context. *Id.* While broad, the insolence regulation is a legitimate prohibition on certain conduct that threatens the orderly operation of the prison. *See Terry v. Morgan*, 930 F.2d 25, 1991 WL 54856, at *3 (7th Cir. 1991) (unpublished table decision) (rejecting the plaintiff's contention that the same insolence regulation was unconstitutionally vague and concluding that "the definition of insolence gave [the plaintiff] fair notice that an obscenity directed at a prison guard is the type of talking that shows disrespect"). Plaintiff has not put forth any other argument why the Court should determine that the insolence regulation is unconstitutional. Thus, Plaintiff's argument that the insolence regulation is unconstitutional is rejected.

## II.     Plaintiff's Punishment Violated His First Amendment Rights.

Plaintiff next contends that even if the insolence statute is constitutionally permissible, its application in this case violated his First Amendment rights. (R. 60, Mot. at 4-6.) Applying the standard set forth in *Martinez*, Plaintiff claims that his letter to Governor Quinn was a valid exercise of his First Amendment rights because it "did not interfere with the penological interests of security, order, or rehabilitation." (R. 60, Mot. at 4.) Specifically, Plaintiff argues that the letter did not implicate the prison system's interest in security because the letter did not contain threats of violence and was directed at someone outside of the prison rather than an individual inside the prison. (R. 60, Mot. at 4-6; R. 70, Reply at 4-5.) Defendants do not dispute that Plaintiff's letter to the Governor contained no threats of violence or bodily harm. However, Defendants argue that Plaintiff's First Amendment rights were not violated because the letter "implicated governmental interest in security, order, and rehabilitation." (R. 66, Resp. at 3.) Specifically, Defendants argue that Plaintiff's remarks "implicated . . . concerns regarding prison discipline and safety" because his letter was directed at the Governor of Illinois who is an "official of the Illinois prison system." (R. 66, Resp. at 5.) As explained below, the Court

8

concludes that Plaintiff's letter was a valid exercise of his First Amendment rights because the letter was not sent to a "prison official" and, therefore, his remarks did not implicate the prison's system's interest in security, order, and rehabilitation. As such, Plaintiff's First Amendment rights were violated when he was punished for the contents of his letter.

In keeping with the difficult task of maintaining order within a prison, courts have repeatedly found that a prison may censor an inmate's correspondence when an insulting or threatening letter is sent to someone outside of the prison, if the inmate explicitly directs the comments not to the recipient of the letter but to a prison official. Courts have consistently held that the inmate's actions implicated the prison's interests of security and order. For example, in *Leonard v. Nix*, 55 F.3d 370 (8th Cir. 1995), an inmate was punished for writing two letters to a former inmate. The letters contained "the most vulgar, obscene, and racist epithets against the warden . . . and other prison staff." *Id.* at 371. The first letter also stated that that the inmate was "certain[] that prison officials would read and copy his letter." *Id.* at 372. As a result of both of his letters, the inmate was punished for violating a regulation that prohibited verbal abuse of another person. *Id.* The inmate brought suit alleging that his First Amendment rights had been violated. *Id.* In finding that the inmate's rights were not violated, the Eighth Circuit stated that "there is a fundamental distinction that can be drawn in the prison context between permissible and constitutionally protected 'unflattering' remarks about prison staff in personal correspondence directed to a recipient on the outside, and impermissible written abusive language that is directed not to the addressee but at and to the warden." *Id.* at 375 (internal citation omitted). Thus, the *Leonard* court concluded that the inmate's First Amendment rights were not violated because the "prison officials disciplined [the inmate] to preserve order, a legitimate penological interest." *Id.*; *see also Carroll*, 17 F. App'x at 394 (concluding that

punishment of inmate did not violate prisoner's First Amendment rights when offending outgoing correspondence was "clearly directed at and meant to [be] read by prison employees"); *Torres v. Clark*, No. 1:CV-10-1323, 2012 WL 4484915, at *9 (M.D. Pa. Sept. 27, 2012) (concluding that the language contained in an outgoing letter was not protected by the First Amendment because the letter contained threats about a prison official and the inmate "knew that [the prison official] was reading his mail" and thus the inmate "communicated the threat" to the prison official).

In contrast, courts have repeatedly held that prison officials may not censor an inmate's outgoing mail when the correspondence contains disparaging or derogatory remarks about a prison official, but the inmate did not direct the remarks to the prison official and did not intend for a prison official to read or intercept the mail. For example, in *Brooks v. Andolina,* 826 F.2d 1266 (3d Cir. 1987), an inmate wrote a letter to the NAACP, "complaining that a female prison guard had searched one of his visitors in a very seductive manner." *Id.* at 1267. The inmate was charged and found guilty of insolence towards a staff member. *Id.* The inmate brought suit alleging that his First Amendment right had been violated. *Id.* Applying the standard set forth in *Martinez*, the Third Circuit concluded that the letter did not "present[] a threat to prison security" and therefore, "the disciplinary action taken against [the inmate] violated his clearly established constitutional rights. *Id.* at 1268-69; *see also Gandy v. Ortiz*, 122 F. App'x 421, 422-23 (10th Cir. 2005) (inmate properly stated First Amendment claim when he alleged that he was punished for writing an outgoing letter to a private company informing the company "of what he believed to be an illegal program being instituted at the prison"); *Loggins v. Delo,* 999 F.2d 364, 367-68 (8th Cir. 1993) (concluding that prison officials could not discipline inmate for writing a letter to his brother, which contained derogatory and insulting remarks about a prison official even

10

though the inmate knew the letter *might* be read by prison officials); *McNamara v. Moody*, 606 F.2d 621, 624 (5th Cir. 1979) (holding that prison could not censor inmate's letter to his girlfriend containing disparaging remarks about prison staff when the "remarks were . . . directed toward the inmate's girlfriend, not the prison staff").

Defendants argue that the Governor of Illinois is an "official of the Illinois prison system" and because the abusive letter were specifically directed at him, "Plaintiff['s] [letter] implicated the same concerns regarding prison discipline and safety as was considered by the Seventh Circuit in *Ustrak* and *Carroll*." (R. 66, Resp. at 5.) Plaintiff disputes Defendants' assertion that the Governor of Illinois is an official of IDOC. Thus, in order to determine whether Plaintiff's remarks were specifically directed at a prison official and therefore the letter implicated the prison's interest in security and order, the Court must determine whether the Governor of Illinois is an official of the Illinois prison system.

In arguing that the Governor is a prison official of IDOC, Defendants rely upon two different statutory provisions contained in the Illinois Unified Code of Corrections, 730 ILL. COMP. STAT. 5/1-1-1 *et seq.*, ("Code of Corrections"). (R. 66, Resp. at 5.) As a preliminary matter, "[s]tatutory interpretation begins with the plain language of the statute." *United States v. Ye*, 588 F.3d 411, 414 (7th Cir. 2009) (internal quotation marks and citation omitted). "[W]here the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *Pittway Corp. v. United States*, 102 F.3d 932, 934 (7th Cir. 1996) (internal quotation marks and citation omitted). Thus, the Court turns to the plain language of Illinois law.

Defendants cite to 730 ILL. COMP. STAT. 5/3-2-5 for the proposition that "[t]he Illinois Governor is the executive directly in charge of the Illinois Department of Corrections." (R. 66, Resp. at 5.) Subsection (a) of Section 3-2-5 states that the "Department of Corrections . . . shall

11

be administered by a Director and an Assistant director appointed by the Governor." 730 ILL. COMP. STAT. 5/3-2-5(a). While the plain language of Section 3-2-5 establishes that the Governor has the power to appoint the head of IDOC, it is the Director and Assistant Director that have the authority to administer IDOC. Indeed, Section 3-2-3 of the Code of Corrections states that "[t]he Department shall be administered by the Director of Corrections who shall be appointed by the Governor" and that "[t]he Director shall establish such Divisions within the Department in addition to those established under Section 3-2-5 as shall be desirable . . . ." 730 ILL. COMP. STAT. ANN. 5/3-2-3. Similar to Section 3-2-5(a), this directive reflects that not only does the Director administer IDOC, but it is the Director, rather than the Governor, that has the authority to establish divisions within IDOC. Indeed, the Seventh Circuit has cited to Section 3-2-3 for the proposition that the Director of IDOC (and not the Governor) is "the state's chief penal officer." *Bridges v. Chambers*, 425 F.3d 1048, 1050 (7th Cir. 2005). Thus, Defendants' reliance on Section 3-2-5(a) of the Code of Corrections is unconvincing.

Defendants also rely on Section 3-2-4 of the Code of Corrections. (R. 66, Resp. at 5 (citing to 730 ILL. COMP. STAT. 5/3-2-4).) Section 3-2-4 provides that "[t]he Governor shall visit the institutions, facilities and programs of the Department [of Corrections] as often as he deems fit, for the purpose of examining into the affairs and conditions of the Department." 730 ILL. COMP. STAT. 5/3-2-4. Again, the plain language of the statute does not state that the Governor is an official *within* IDOC. Instead, the statute establishes that, as the state's highest elected official, the Governor has the authority to visit the prisons as he wishes to inquire about the conditions of IDOC. Thus, this statute does not, as Defendants suggest, demonstrate that the Governor is an official within the prison system. The two statutes cited by Defendants clearly establish that the Governor has the authority to hire and fire the Director of IDOC and that the

Governor has the authority to monitor the conditions of the prisons. However, the plain language of these statutes does not demonstrate that the Governor is within IDOC or deemed a prison official. Aside from these two statutes, Defendants have not put forth any other conclusive statutory provisions or persuasive case law that demonstrates that the Governor of Illinois is an official of IDOC.[1]

The Seventh Circuit's discussion in *Kiddy-Brown v. Blagojevich*, 408 F.3d 346 (7th Cir. 2005), is instructive. In *Kiddy-Brown*, the Seventh Circuit addressed whether the Governor of Illinois is authorized to make IDOC employment decisions and, specifically, whether the Governor has the power to make binding oral employment contracts with IDOC employees. *Id.* at 362. In rejecting the plaintiff's argument that the Governor did have such authority, the Court stated that Illinois law "vests the head of the Department of Corrections with authority to appoint the administrative officers of the Department." *Id.* (citing 730 ILL. COMP. STAT. 5/3-2-2 and 20 ILL. COMP. STAT. 5/5-20). The Court explained that Section 3-2-2 of the Code of Corrections "simply establishes the powers and duties of the Illinois Department of Corrections and authorizes the Department of Corrections 'to appoint and remove the chief administrative officers,' . . . but it does not vest any hiring or firing powers in the Governor." *Id.* at 362 n.13 (quoting 730 ILL. COMP. STAT. 5/3-2-2)). The Seventh Circuit also cited to another statutory provision which permits departments "such as IDOC, to 'obtain necessary employees,' but makes no reference to the Governor." *Id.* (citing 20 ILL. COMP. STAT. 5/5-645). Thus, the

---

[1] While no parties discuss this statute, another provision suggests that the Governor of Illinois is not an official of the Illinois prison system, but an outside monitor of the system. Section 3-2-2(l) of the Code of Corrections states that the Department shall "report annually to the Governor on the committed persons, institutions and programs of the Department." 730 ILL. COMP. STAT. 5/3-2-2(l). The language of this statute indicates that the Governor is not a part of the IDOC but, similar to Section 3-2-4, the Governor is the state's highest elected official to whom the IDOC gives an annual report as to the conditions of the prison system.

13

Seventh Circuit concluded that "it is clear that Illinois statutes do not grant the Governor the authority to bind the State" to an oral employment contract for IDOC administrative employees. *Id.* at 362; *see also Snyder v. Blagojevich*, 332 F. Supp. 2d 1132, 1141 (N.D. Ill. 2004) (concluding that while the Governor holds "the ultimate budgetary reins in Illinois and [can] institute a hiring and promotion freeze to stabilize the governmental payroll," there is nothing in the Illinois Constitution, Illinois statutes, or any executive orders that establishes that the Governor has "control over [I]DOC employment decisions"). In other words, if the Governor of Illinois does not have the authority to make hiring decisions for IDOC (beyond the power to appoint the Director of IDOC), the Governor cannot be deemed to be an official of IDOC.

By contrast, the statutory language of another state demonstrates an example in which a governor would be considered a prison official. In *Graddick v. Newman*, 453 U.S. 928, 932 (1981), the Supreme Court declared that the Governor of Alabama had full responsibility for the maintenance of the state's prisons. In that case, the district court had entered an order naming the Governor of Alabama as the receiver of the Alabama Prison System. *Id.* at 931. The district court's order "provided that all powers, duties, and authority of the Alabama Board of corrections were transferred to the Receiver." *Id.* at 931-32. Following the order, the Alabama Legislature "abolished the Alabama Board of Corrections and transferred its powers, duties, and authority to the Governor." *Id.* at 932 (citation omitted). The relevant Alabama statute provided: "All duties, responsibilities, authority, power, assets, liabilities, property, funds, appropriations, contractual rights and obligations, property rights and personnel, whether accruing or vested, by operation or by law . . . are hereby vested in the Governor of the State of Alabama." ALA. CODE 1975 § 14-1-15 (1979). As the Supreme Court concluded, "by court order and by Alabama law, responsibility for the maintenance of Alabama prisons has now rested for more than two years

in" the Governor of Alabama. *Id.* at 932. The discussion in *Graddick* and the relevant Alabama statutory language presents a clear contrast to Illinois statutory authority, which in no way suggests that the Governor is an official of IDOC.

The Governor of Illinois is the highest elected public official in Illinois and has the authority to appoint the Director of IDOC; however, contrary to Defendants' insistence, the Governor is not "an official of the Illinois prison system." (R. 66, Resp. at 5.) Thus, because the Governor is not a prison official, the Court concludes that Plaintiff's letter was not written to, directed at, or sent to an IDOC prison official but was intended instead for an outside party. The Court now turns to the standard set forth in *Martinez* to determine whether censorship of Plaintiff's letter was constitutional.

"Although it is true that an inmate's interest in sending mail is protected by the First Amendment, a challenged regulation or practice allowing censorship of outgoing mail is constitutional if it promotes 'one or more of the substantial governmental interests of security, order, and rehabilitation,' and is 'no greater than is necessary . . . to the protection of the particular governmental interest involved.' " *Carroll*, 17 F. App'x at 393 (quoting *Martinez*, 416 U.S. at 413). "Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements." *Martinez*, 416 U.S. at 413. In addition, "[i]f prison officials cannot censor unflattering statements made in letters to outsiders, they also may not punish an inmate for the contents of such letters." *Andolina*, 826 F.2d at 1268. A prisoner's personal outgoing mail does not generally pose a serious threat to prison order and security. *Thornburgh*, 490 U.S. at 411. Thus, "a prisoner's personal outgoing mail is unrestricted unless it falls into categories which present a threat to prison order and security, such as, but not limited to, 'escape plans, plans related to ongoing criminal activity, and

15

threats of blackmail or extortion.'" *Leonard*, 55 F.3d at 374 (quoting *Thornburgh*, 490 U.S. at 412).

While certainly offensive, Plaintiff's letter did not pose a danger to the prison system. The parties agree that the letter does not contain any threats of violence of any kind. A review of the letter also demonstrates that it does not contain escape plans or details of ongoing criminal activity. In addition, there is nothing on the face of the letter or in the record that demonstrates that Plaintiff intended for a prison official to read the letter or knew that a prison official would read the letter; indeed, the only reason anyone at Stateville read this letter was because Governor Quinn's office forwarded the letter to the prison. Plaintiff's letter was an unfortunate and ill-advised attempt to convey his frustration—whether justified or not—with IDOC. Plaintiff was unhappy because he claimed that his cell was frequently searched, his property was destroyed, his requests for a cell transfer had gone ignored, and he believed that the Governor had contributed to the corruption that he felt permeated through IDOC. While these complaints were unnecessarily rude and derogatory, the contents of the letter presented no threat to prison security. Indeed, Defendants spend no time in their response explaining how the letter implicates the prison system's concerns of security and order.

Plaintiff's comments were no doubt unwelcome and unsettling to Governor Quinn or any other individual in his office who may have read the letter; however, "[t]he fact that protected speech may be offensive to some does not justify its suppression." *Carey v. Population Servs. Int'l*, 431 U.S. 678, 701 (1977); *see also FCC v. Pacifica Foundation,* 438 U.S. 726, 745 (1978) ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it"). Likewise, the fact that if Plaintiff had made these insults to a prison official face-to-face, he would have been punished is also irrelevant because the facts of this case

16

demonstrates that the comments were not directed to a prison official, but to a third party. *See, e.g., McNamara*, 606 F.2d at 624.

The Court concludes as a matter of law, the comments made in Plaintiff's letter—while offensive, aggressive, and vulgar—"did not present a danger to the community *inside* the prison." *Thornburgh*, 490 U.S. at 411-412. Plaintiff had an established First Amendment right to express himself in this letter, and that right was violated when he was punished for the contents of his letter and placed in solitary confinement. Therefore, as the Court finds no material facts in dispute with regard to the contents of Plaintiff's letter, it concludes that punishing Plaintiff for the contents of the letter violated his First Amendment rights. *See, e.g., Loggins*, 999 F.2d at 367-68 (finding as a matter of law that letter containing coarse and insulting remarks did not threaten prison security); *see also Tate v. Jenkins*, No. 09-cv-169, 2010 WL 3809765, at *2, 6-8 (E.D. Wis. Sept. 24, 2010) (concluding that the contents of a letter complaining of "prison conditions, staff misconduct, concerns of racism, and illegal confiscation of legal property" that was sent to the Governor of Wisconsin and others, was protected conduct under the First Amendment); *Moore v. Miller*, No. 96 C 1347, 1997 WL 269595, at *1, 5-7 (N.D. Ill. May 12, 1997) (censorship of inmate's letter, which was offensive but "contained no threats" and was not a "threat to security or safety" violated inmate's First Amendment rights). Thus, Plaintiff has established a First Amendment violation.

### III. Defendants' Personal Responsibility.

In order to hold Defendants liable for deprivations of constitutional rights pursuant to 42 U.S.C. § 1983, Plaintiff "must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Knight v. Wiseman*, 590 F.3d 458 (7th Cir. 2009) (citation omitted); *see also Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009). Thus, the Court can only

grant summary judgment against those Defendants who Plaintiff establishes were personally responsible for the deprivation of his First Amendment rights.

Plaintiff has established personal responsibility for the deprivation of his First Amendment rights with regard to Defendants Wright and Franklin. It is undisputed that they were the members of the Adjustment Committee and that these two individuals found Plaintiff guilty of the insolence charge and recommended his transfer to Stateville's disciplinary segregation unit. (R. 67, Defs.' Resp. to Pl.'s Facts ¶¶ 18-19.) Plaintiff was deprived of his First Amendment rights when he was found guilty of insolence and punished. Defendants Franklin and Wright personally contributed to and were responsible for this deprivation. Therefore, the Court grants summary judgment in favor of Plaintiff and against Defendants Franklin and Wright.

However, Plaintiff fails to establish personal responsibility for the deprivation of his First Amendment rights with regard to any of the other Defendants. While Defendants Pierce and Turner were involved in initially charging Plaintiff with insolence, Plaintiff fails to connect their actions to the conduct that actually deprived Plaintiff of his First Amendment rights. Plaintiff was deprived of his rights when the Adjustment Committee found him guilty of insolence and recommended that he be punished with disciplinary segregation, not when he was initially charged with insolence. *See Stewart v. McGinnis*, 800 F. Supp. 604, 612 (N.D. Ill. 1992) (finding prison official who submitted a disciplinary report regarding the plaintiff's removal to disciplinary segregation not personally responsible for the subsequent deprivation of the plaintiff's due process rights because his duty to the plaintiff ended after he wrote the initial report and sent it to the Adjustment Committee). Defendants Pierce and Turner cannot be held liable for the filing of the initial insolence charge, and Plaintiff has not shown that they had any

18

knowledge of or role in the Adjustment Committee's ultimate ruling and punishment recommendation. Therefore, the Court denies summary judgment against Defendants Pierce and Turner.

Finally, Plaintiff's second amended complaint name Warden Tarry Williams and correctional officers Rabideau, Reed, and Christopher Williams as defendants; however, the motion for summary judgment makes no effort to connect the actions of these Defendants to the deprivation of his First Amendment rights. *See De Jesus v. Odom*, 578 F. App'x 598 (7th Cir. 2014) (affirming summary judgment in favor of a prison official on an inmate's Section 1983 claim, noting that there was no evidence that the defendant "played any role in the placement" of the inmate into segregation, and concluding "[b]ecause § 1983 requires a showing of personal involvement, . . . the absence of evidence showing [the defendant's] personal involvement dooms his claim"). Therefore, the Court also declines summary judgment against these Defendants.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (R. 60) is GRANTED in part and DENIED in part. Plaintiff's motion for summary judgment on Count I of his second amended complaint is granted as to Defendants Colleen M. Franklin and Clarence D. Wright. As to all other Defendants, Plaintiff's motion for summary judgment on Count I of his second amended complaint is denied. The Court enters a judgment of liability only in favor of Plaintiff on Count 1 against Defendants Franklin and Wright and reserves the issue of damages until the resolution of Plaintiff's remaining two claims.

The parties shall appear for a status hearing on September 20, 2016, at 9:45 a.m. to establish deadlines for the remainder of this case. Finally, the parties are DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all settlement possibilities prior to the status hearing.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: August 23, 2016**