IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FABIAN SANTIAGO,           )
                           )
        Plaintiff,         )
                           )      No. 15 C 1856
    v.                     )
                           )      Magistrate Judge Jeffrey T. Gilbert
KAREN RABIDEAU, *et al.*,  )
                           )
        Defendants.        )

MEMORANDUM OPINION AND ORDER

Plaintiff Fabian Santiago ("Santiago"), a prisoner at Stateville Correctional Center ("Stateville"), sued eight named Defendants and ten John Doe Defendants, all of whom are employees of the Illinois Department of Corrections ("IDOC"). The named Defendants include Karen Rabideau ("Rabideau"), a Placement Officer; Leslie Turner ("Turner"), an Internal Security Investigator; Mindi Pierce ("Pierce"), a Correctional Officer assigned to Stateville's Internal Affairs Unit; Colleen Franklin ("Franklin"), a Correctional Counselor; Clarence Wright ("Wright"), a Correctional Lieutenant; Daniel Reed ("Reed"), a Correctional Officer; Christopher Williams ("C. Williams"), a Correctional Officer; and Tarry Williams ("Warden Williams"), Stateville's Warden.

Santiago brought this action pursuant to 42 U.S.C. § 1983 claiming that Defendants violated his rights guaranteed by the First, Eighth, and Fourteenth Amendments of the United States Constitution. Count One of Santiago's Second Amended Complaint alleges that Rabideau violated Santiago's First Amendment rights by transferring a disruptive inmate into his cell at Stateville in retaliation for grievances and lawsuits that Santiago previously had filed. Count One also alleges five of the remaining individual Defendants violated Santiago's First Amendment

rights by transferring him to an undesirable section of Stateville in retaliation both for Santiago's earlier grievance filings and a letter he wrote in August 2014 to then Illinois Governor Patrick J. Quinn, as described more fully below. ([ECF No. 150], at ¶¶ 38-47). Count Two alleges that Defendants Wright and Franklin violated Santiago's due process rights under the Fourteenth Amendment because of their actions in connection with a disciplinary hearing held concerning Santiago's letter to Governor Quinn, and Santiago's subsequent transfer to another section of Stateville. (*Id.* at ¶¶ 48-51). Count Three alleges that Warden Williams, C. Williams, Wright, Franklin, Reed, and John Does 1-10 violated Santiago's Eighth Amendment rights through their alleged deliberate indifference to the conditions of F-House, the section of Stateville to which Santiago was transferred as a result of his letter to Governor Quinn. (*Id.* at ¶¶ 52-56). The Second Amended Complaint also alleges that Defendant Rabideau has continued to retaliate against Santiago by placing him in cells with inmates with whom he is likely to have a confrontation. ([ECF No. 28], at ¶ 57). Santiago requests declaratory and injunctive relief based on this alleged retaliation. (*Id.* at ¶ 59).

This case was first assigned to Chief District Judge Ruben Castillo. On August 23, 2016, Judge Castillo granted partial summary judgment in favor of Santiago on his First Amendment claim in Count One of his Complaint, finding that Defendants Wright and Franklin, as members of the Adjustment Committee that heard the charges against Santiago related to his letter to Governor Quinn, violated Santiago's First Amendment rights by punishing him for writing the letter. The Court found that, because Governor Quinn was not an official of the Illinois prison system, Santiago had a First Amendment right to send the letter to the Governor without retaliation from IDOC since the letter did not implicate the prison system's interest in security, order, and rehabilitation. The Court denied Santiago's Motion for Summary Judgment on his First

Amendment claim against Warden Williams because Santiago had not shown that he personally was responsible for the deprivation of his First Amendment rights. *See Santiago v. Rabideau*, 2016 WL 4490578, at *9 (N.D. Ill. Aug. 23, 2016). The Court reserved the issue of Santiago's entitlement to compensatory damages pending the resolution of Santiago's remaining claims. *Id.* at *9.

On May 18, 2017, the parties consented to the jurisdiction of this magistrate judge for all proceedings through and including the entry of final judgment. *See* [ECF No. 92]. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). Defendants now have filed a Rule 56 Motion for Partial Summary Judgment [ECF No. 148] on Counts One, Two, and Three of Santiago's Second Amended Complaint. Defendants also argue that Santiago has not experienced continuing retaliation as he alleges in paragraphs 57-59 at the end of his Complaint in an un-numbered "count" after Count Three, and that he is not entitled to compensatory damages. For the reasons discussed below, Defendants' Rule 56 Motion for Partial Summary Judgment is granted in part and denied in part. This case will proceed to trial against Defendants Wright and Franklin on Santiago's First and Fourteenth Amendment claims, and against Warden Williams and, potentially, C. Williams and Reed since Defendants did not move on these two Defendants' behalf, on Santiago's Eighth Amendment claim.

## I. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 951 (7th Cir. 2013). In deciding a motion for summary judgment, the court "review[s] the evidence in the record in the

light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor." *NES Rental Holdings, Inc. v. Steine Cold Storage, Inc.*, 714 F.3d 449, 452 (7th Cir. 2013); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The party opposing the motion "gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011). However, the opposing party cannot rely on mere conclusions and allegations to create factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Nor can speculation be used "to manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citation omitted). A court will grant summary judgment "if no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (internal quotes and citation omitted).

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts with "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts . . ." N.D. Ill. R. 56.1(a). Then, "the party opposing the motion for summary judgment is required to file and serve 'a concise response to the movant's statement that shall contain . . . a response to each numbered paragraph in the affidavits, parts of the record, and other supporting materials relied upon.'" *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) (quoting N.D. Ill. R. 56.1(b)(3)(B)). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Id.* Specifically, the responding party's failure "to cite to any admissible evidence to support facts presented in response" renders "the facts presented by the moving party as undisputed." *Id.* Because Local Rule 56.1 serves an important function by organizing evidence and identifying disputed facts, the

district court has discretion to require strict compliance. *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015); *F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). The evidence supporting a factual contention need not be admissible in itself, but "it must represent admissible evidence." *Malec v. Stanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000).

A number of Santiago's Rule 56.1 submissions do not comply with these guidelines because they are non-responsive and argumentative. (Pl.'s Resp. to Defs.' SOF Nos. 20, 21, 22, 23, 35). *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n. 2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts."). Courts expect strict compliance with Local Rule 56.1 and have ample discretion to strike improper submissions. *See Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-810 (7th Cir. 2005) (citing cases). In the interest of time and efficiency, rather than parsing the parties' Local Rule 56.1 submissions in this Memorandum Opinion, the Court will ignore (or to the extent procedurally necessary, strike) the parties' submissions that do not comply with Local Rule 56.1 and refer below only to those that meet the standard of the Local Rule. Those facts discussed below are the facts the Court has considered in ruling on the pending Motion.

## II. FACTUAL BACKGROUND

Neither Defendants nor Santiago provide a separate statement of facts in their memoranda of law. *See Duchossois Indus., Inc. v. Crawford & Co.*, No. 99 C 3766, 2001 WL 59031, at *1 (N.D. Ill. Jan. 19, 2001) (noting that "LR 56.1 statements are not intended to be substitutes for a statement of facts section of a memorandum of law"). Nevertheless, the Court's own review of the record reveals the following facts. Santiago was an inmate at Stateville in 2014 and was housed in C-House in cell 838. (Defs.' SOF No. 22). On July 11, 2014, Defendant Rabideau transferred inmate Jovan Daniels to Santiago's cell. (*Id.*). Santiago was classified as a "moderate escape

risk," while Daniels was considered to be a Level-E, or "extremely high escape risk." (*Id.*). As a result, more frequent searches of the two inmates ensued. In August 2014, Santiago wrote a letter to then Illinois Governor Patrick Quinn objecting to these searches and what he perceived to be IDOC's lack of response to his complaints. The letter, in its entirety, read as follows:

8/20/2014

To: Mr. Patrick J. Quinn

Listen to me you faggot motherfucker! I wrote your punk ass almost a month ago notifying your office of these piece [sic] of shit, corrupt prison officials deliberately having me placed into a celling [sic] location with an [inmate] categorized as an extremely high escape risk in order to justify having my cell searched every several days, completely destroying my cell, stealing my property & provoking physical confrontations between myself, my cellmate & prison guards. These are criminal acts of misconduct & your fuckin racist & corrupt office is refusing to do anything about these abuses.

I have already filed an emergency grievance dated: 8/3/14, concerning these abuses & this punk ass warden has refused to take correct action. I have every intention on filing suit in federal court and your offices [sic] roll [sic] in disregarding & concealing these abuses will be stipulated. You have allowed a cess pool [sic] of corruption & abuse against [inmates] to plague IDOC & haven't done shit to address these matters – I can only hope you lose the election you fuckin [sic] asshole.

([ECF No. 72], at 2).

Warden Williams' office subsequently received a copy of Santiago's letter and forwarded it to Stateville's Internal Affairs Unit. (Defs.' SOF No. 14). Following an investigation of the letter, a Disciplinary Report was issued that accused Santiago of "insolence" on the ground that his letter was "very disrespectful" and constituted a "major infraction." ([ECF No. 72], at 2). "Insolence" is defined in the prison regulations as "[t]alking, touching, gesturing, or other behavior that harasses, annoys or shows disrespect." (*Id.*, quoting Il. Admin. Code 20, § 504, Table A (2001)). Santiago then was brought before an IDOC Adjustment Committee on the insolence charge on September 8, 2014. The Committee was composed of Defendants Wright and Franklin.

6

(*Id.*). Santiago alleges that the Committee ignored evidence he presented and refused to allow him to speak. (Pl.s' Resp. to Defs.' SOF No. 38). Defendants claim Santiago was given the opportunity to object to Wright as member of the Committee based on lack of impartiality, but he failed to do so. (Defs.' SOF No. 37). Santiago claims he did so, but Wright refused to recuse himself. (Pl.'s Resp. to Defs.' SOF No. 37). Defendants state the hearing lasted 30 minutes; Santiago estimates it lasted only three minutes. (Defs.' SOF No. 38; Pl.'s Resp. to Defs.' SOF No. 38).

Santiago was found guilty of insolence, and the Adjustment Committee issued a Final Summary Report recommending that he be transferred to F-House, Stateville's disciplinary segregation unit, for one month. (Defs.' SOF No. 40). Santiago was placed in segregation in F-House on September 12, 2014 and was released back into the general population on October 10, 2014 to another cell in F-House. (Defs.' SOF No. 24). F-House is a "panopticon" structure – a circular building with four tiers of 62 cells on each tier. (Defs.' SOF No. 25). The parties dispute the conditions that prevailed at F-House when Santiago was housed there. Defendants claim the noise level in F-House is similar to that in the general population. (Defs.' SOF No. 29). Santiago disagrees, claiming that he was subjected to extreme levels of screaming, kicking, and fighting. (Pl.'s Resp. to Defs.' SOF No. 29). He further states that, although showers were offered once a week, the condition of the showers was "inhumane and nasty," including cold air that came through a broken window. (Pl.'s Resp. to Defs.' SOF No. 31).

Santiago also states that he was subjected to soiled mattresses, vermin, reduced meal portions, food that was contaminated by pests, and roaches that crawled on him during the night. (Pl.'s SOAF No. 6). He claims, for example, that his bedding was "a shit and piss stained mattress that was dragged throughout the segregation floor and had been splattered with spaghetti food on it and [had] stains. It was disgusting." ([ECF No. 165], Ex. 7 at 131). He asserts that, in addition

to sleep deprivation, he was afflicted with headaches, anxiety, and depression as a result of these conditions. (Pl.'s SOAF No. 8). Santiago testified that he lost 20 pounds while he was in F-House, although he never requested to see a doctor after he left the segregated unit. (Defs.' SOF Nos. 48-50).

## III. DISCUSSION

### A.    The First Amendment Issues

To prevail on a First Amendment retaliation claim, Santiago must demonstrate that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that is likely to deter future activity that is protected by the First Amendment; and (3) the First Amendment was "at least a motivating factor" in the defendants' retaliation. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)). "[A] plaintiff alleging First Amendment retaliation must prove by a preponderance of the evidence that his or her protected activity was a motivating factor in the defendant's retaliatory action." *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004). Thus, an individual defendant "must have caused or participated in a constitutional deprivation" in order to be liable. *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005).

As discussed above, the Court already has determined that Defendants Wright and Franklin violated Santiago's First Amendment rights by voting as members of the Adjustment Committee to punish Santiago for writing the letter to Governor Quinn. Santiago also alleges that Defendants violated his First Amendment rights in other ways. Rabideau allegedly denied Santiago's rights by transferring Jovan Daniels to his cell in retaliation for previous grievances and civil rights lawsuits that Santiago had filed. ([ECF No. 28], at ¶ 38). Santiago claims that Wright and Franklin retaliated against him at the Adjustment Committee hearing when they allegedly refused to review

8

Santiago's evidence and did not let him speak at the hearing as well as by recommending that he be transferred to F-House. (*Id.* at ¶¶ 40, 41). Santiago further alleges that Warden Williams violated the First Amendment when he overlooked the wrongdoings of the personnel under his command, approved their actions, and failed to stop their retaliatory actions. (*Id.* at ¶ 42). Specifically, Warden Williams allegedly (1) approved Rabideau's transfer of Daniels to Santiago's cell, (2) refused to investigate Santiago's "emergency grievances," (3) denied those grievances, and (4) approved the disciplinary transfer to F-House.[1] (*Id.* at ¶ 43). The Court addresses each of these issues in turn.

### 1. The Insolence Issue

#### a. The Adjustment Committee's Finding

An official must be personally responsible for a constitutional deprivation in order to be liable for it. "That is, he 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye . . . .'" *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (internal quotes and citation omitted). The official does not have to have participated directly in the action that involves a constitutional violation. Mere negligence concerning a subordinate's actions is not sufficient, however, and the official must have acted "either knowingly or with deliberate, reckless indifference." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (internal quotes

---

[1] As noted earlier, the Second Amended Complaint also alleges that Franklin, Wright, and Warden Williams violated Santiago's First Amendment rights through their involvement in the September 2, 2014 hearing that resulted in Santiago's insolence ticket. Defendants raise several claims about these Defendants' motives and participation in the hearing, but the Judge Castillo already ruled that the insolence ticket did not violate the First Amendment. *See Santiago*, 2016 WL 4490578, at *8 ("Plaintiff was deprived of his rights when the Adjustment Committee found him guilty of insolence and recommended that he be punished with disciplinary segregation, *not when he was initially charged with insolence*.") (emphasis added). Without a constitutional violation, Defendants' arguments on this issue are superfluous.

and citation omitted). Vicarious liability does not apply. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001).

Defendants Wright and Franklin already have been held liable for their Adjustment Committee votes to punish Santiago for writing the letter to Governor Quinn. Defendants argue that Warden Williams is entitled to summary judgment because he played no role in the Adjustment Committee hearing or the disciplinary action that followed the Committee's finding. ([ECF No. 149], at 3). Santiago has not replied to this or any other First Amendment argument in his response brief.[2] In his Local Rule 56.1 submissions, however, Santiago notes that Warden Williams' signature appears on the second page of the Committee's September 8, 2014 Disciplinary Report, though it was signed four days later on September 12, 2014. ([ECF No. 165], Ex. 1 at 2). The mere appearance of Warden Williams' signature, however, does not create a material fact issue about his participation in the proceeding. Warden Williams testified in his affidavit that he designated a subordinate to review all Adjustment Committee reports, and that he authorized the designee to sign the Warden's name with the designee's initials inscribed next to it. ([ECF No. 150], Ex. G at ¶ 2). At the time the Adjustment Committee report was issued in this case, Victor Calloway was the Warden's designee. (*Id.* at ¶ 4). The affidavit explains that Calloway reviewed and signed the Adjustment Committee's report with Calloway's initials circled beside the signature – both of which appear on the report. (*Id.*). As for the disciplinary

---

[2] The Court disagrees with Defendants that Santiago's failure to respond automatically entitles them to summary judgment on all remaining First Amendment issues. The Federal Rules make clear that summary judgment is not to be granted by default. "Even if the opposing party completely fails to respond to a summary judgment motion, Rule 56(e) permits judgment for the moving party only "*if appropriate* – that is, if the motion demonstrates that there is no genuine issue of material fact *and* that the movant is entitled to judgment as a matter of law." *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) (internal quotes and citation omitted). Despite his failure to address this central aspect of Defendants' motion and the Second Amended Complaint, Santiago has responded to those portions of Defendants' Statement of Facts that Defendants claim entitle them to summary judgment on the First Amendment claims.

recommendation, Warden Williams states that he did not "personally review or sign Plaintiff's Report;" he does not ordinarily take a role in an inmate's placement at Stateville; and he had no involvement in the decision to place Santiago in F-House. (*Id.* at ¶¶ 4-6). Santiago does not dispute any of these claims in his Local Rule 56. 1 submissions and they are therefore deemed admitted. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Santiago also has failed to cite any evidence showing that Warden Williams was informed about alleged retaliation against Santiago or that Warden Williams turned a blind eye to his subordinates' actions. ([ECF No. 28], at ¶ 42). As far as the Court can discern, only three individuals were involved with the Adjustment Committee's finding – Franklin and Wright (who formed the Committee and signed the report) and Calloway (who later signed the report for Warden Williams). Both Franklin and Wright testified that they never discussed the Committee's proceedings or findings with Warden Williams. (Defs.' SOF No. 14). No evidence suggests Calloway had any communication with Warden Williams on the matter. (Pl.'s Resp. to Defs.' SOF No. 17). Santiago has not presented any evidence to rebut this claim. Thus, Santiago has failed to show that a fact issue exists concerning Warden Williams' role in finding Santiago guilty of insolence. Defendants' Motion, therefore, is granted on this issue as to Warden Williams.[3]

### 2. Jovan Daniels' Transfer

An inmate has a right under the First Amendment to file grievances about the conditions of his or her confinement or the mistreatment of his personal property. *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010). "Thus, a prison official may not retaliate against a prisoner because

---

[3] The Second Amended Complaint is not limited to the allegation that Warden Williams was motivated by Santiago's letter to Governor Quinn; it also alleges that Warden Williams took action against Santiago because of his grievances and civil rights lawsuits. ([ECF No. 28], at ¶ 43). The Court need not address those allegations. Since no evidence shows that Warden Williams participated in the actions that constituted a First Amendment violation, Santiago's allegations concerning his motive are moot.

that prisoner filed a grievance." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). Count One of the Second Amended Complaint alleges that Rabideau violated Santiago's First Amendment rights by transferring inmate Jovan Daniels to Santiago's cell in retaliation for grievances and civil rights lawsuits Santiago had filed. Count One further alleges that Warden Williams approved Rabideau's actions. Santiago claims that Rabideau chose Daniels because, as a high-risk prisoner, she knew that his presence in Santiago's cell would lead to increased searches of both cellmates.

Unfortunately, neither party has identified the grievances or lawsuits that are at issue in Santiago's retaliation claim, making it impossible for the Court to discern the full evidentiary basis for Santiago's contention. The Court's own review shows that Warden Williams states in his affidavit that he did not review Santiago's grievances numbered 2122, 2443, 2634, 2799, or 2800 ([ECF No. 150], Ex. G at ¶ 3), but these grievances are irrelevant to the issue because they all post-date Daniels' July 11, 2014 transfer to Santiago's cell.[4] Grievance No. 2122 was received by the IDOC on August 5, 2014, over three weeks after the transfer. ([ECF No. 150], Ex. G at Ex. 1). Grievance No. 2443 was filed on August 3, 2014 and requests Daniels' removal from Santiago's cell. (*Id.*). Number 2634 is dated August 29, 2014; No. 2799 is dated September 8, 2014; and No. 2800 is dated September 12, 2014. (*Id.*). Santiago has not addressed how Defendant Rabideau could have been motivated by grievances that were filed after Daniels was placed in the same cell as Santiago.

---

[4] The IDOC write-up for grievance No. 2634 states that Santiago previously had filed a lawsuit against Defendant Turner "for carrying out all manner of abuse & misconduct." ([ECF No. 150], Ex. G at Ex. 1). The parties do not address whether this is the lawsuit to which the Second Amended Complaint refers, or whether other suits are at issue. The Court declines to ferret through the nearly 600 pages of exhibits that the parties have submitted with their memoranda in the hopes of findings information whose identification lies squarely with the parties themselves. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

As for other grievances that may be involved with Count One, Defendant Rabideau states in her affidavit that, although she currently is a Placement Officer at Stateville who is responsible for placing two inmates in the same cell, she formerly responded to Santiago's grievances in her role as his Correctional Counselor. ([ECF No. 165], Ex. 4 at ¶¶ 2, 8). Like Santiago, Rabideau does not identify what those grievances were, but she states that she did not take them into consideration when she placed any inmate in the same cell as Santiago. Instead, she considered factors such as the inmates' compatibility, differences in age and security profiles, projected release dates, and the inmates' respective history of issues with other cellmates. (*Id.* at ¶¶ 3, 8).

Santiago responds, without explanation, that "there is ample reason to disbelieve" Rabideau's statement. (Pl.'s Resp. to Defs.' SOF No. 22). That might be plausible had Santiago identified a grievance, the content and proximity of which in time to Daniels' transfer could support such an inference. *See DeWalt*, 224 F.3d at 618-19 (stating that a retaliatory motive can be inferred based on an adequate chronology of events). Without identifying a specific grievance or lawsuit, however, Santiago questions Rabideau's motive on grounds that are purely speculative, thereby failing to show why summary judgment should not be entered as it concerns Rabideau. *See Hedberg v. Ind. Bell Telephone Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demotion of which is a primary goal of summary judgment."). As for Warden Williams, Santiago concedes that he was not directly involved in transferring Daniels to his cell. (Pl.'s Resp. to Defs.' SOF No. 41). The Second Amended Complaint alleges that Warden Williams approved Rabideau's transfer decision, but neither Santiago's response brief nor his Statement of Additional Facts addresses that topic. Defendants' Rule 56 Motion for Partial Summary Judgment, therefore, is granted on all the remaining First Amendment issues.

**B.     The Fourteenth Amendment Issues**

Count Two of the Second Amended Complaint alleges that Defendants Wright and Franklin violated Santiago's Fourteenth Amendment due process rights by holding a hearing on the insolence charge without reading the materials Santiago had submitted or permitting him to speak.  Santiago contends that he had a Fourteenth Amendment interest in the outcome of the hearing, and that transferring him to F-House imposed a "significant hardship" on him.  ([ECF No. 28]), at ¶¶ 48-50).  Defendants interpret these allegations as comprising two claims:  (1) Santiago's transfer to, and 28-day stay in, F-House violated his Fourteenth Amendment interests, and (2) issues surrounding the hearing on the insolence charge violated his liberty interests guaranteed by the Due Process clause.

**1.     The Transfer to F-House**

A prisoner's transfer to a segregated disciplinary unit does not automatically implicate a due process liberty interest.  *Sandin v. Conner*, 515 U.S. 472, 485-86 (1995).  Instead, a prisoner's Fourteenth Amendment rights may be at issue if the conditions of the segregated unit impose an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Id.* at 484.  As a result, "the right to litigate disciplinary confinements has become vanishingly small." *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997).  Courts decide whether a disciplinary transfer impinges on a prisoner's Fourteenth Amendment rights by looking at "the combined import of the duration of the segregative confinement *and* the conditions endured." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009).  Relatively short stays of confinement do not give rise to a liberty interest; longer stays may do so if the conditions of the disciplinary unit impose unusually difficult hardships. *Hardaway v. Meyerhoff*, 734 F.3d 740, 743-44 (7th Cir. 2013).

Santiago argues that he had a liberty interest in not being sent to segregation in F-House, and that his 28-day confinement there "obviously" violated that right. ([ECF No. 164], at 5). Courts consistently have held, however, that lengthier terms of confinement in segregated prison units do not give rise to a liberty interest. In *Sandin, supra*, for example, the Supreme Court found that 30 days of disciplinary confinement "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Sandin*, 515 U.S. at 486. Other courts have reached the same conclusion for even longer periods of confinement. *See Thomas v. Ramos*, 130 F.3d 754, 760-62 (7th Cir. 1997) (finding the same for a 70-day disciplinary segregation at the Stateville prison); *Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir. 1995) (stating that six months of segregation do not constitute "such an extreme term" that, standing alone, a prisoner's Fourteenth Amendment rights were triggered).

Santiago overlooks that a liberty interest does not arise unless the length of the confinement and the conditions of the segregated unit – in combination – are unusually harsh. *See Marion*, 539 F.3d at 697-98; *Hardaway*, 734 F.3d at 743. Santiago refers the Court to his Statement of Additional Fact No. 7 and to his deposition testimony as evidence of the conditions he encountered. Statement of Additional Fact No. 7 claims that Santiago lost 20 pounds during his stay at F-House, at least in part because he was given food that had been infested by roaches and other vermin. (Pl.'s SOAF No. 7). Santiago testified in his deposition that F-House was a loud environment that included "mind shattering kicking, pounding, screaming, [and] fighting;" the showers displayed "inhumane and nasty conditions;" and broken windows let in cold air. (Pl.'s Resp. to Defs.' SOF Nos. 29, 31). Santiago also claims that he was subjected to mold, foul smells, a soiled mattress, and rodents that crawled over him in the night. (Pl.'s SOAF No. 6).

The conditions that Santiago describes present a sobering portrait of a difficult environment. Indeed, Santiago points out that former Illinois Governor Bruce Rauner closed F-House in 2016 because it created "safety and operational hazards" for both the inmates and Stateville's staff. ([ECF No. 165], at Ex. 10). That does not mean, however, that these harsh conditions gave rise to or implicated a Fourteenth Amendment interest. Courts repeatedly have concluded that conditions similar to those that Santiago describes do not implicate a liberty interest, including conditions at F-House itself. In *Sanchez v. Walker*, 2010 WL 5313815, at *5 (N.D. Ill. Dec. 17, 2010), for instance, the Court found that an inmate's six-month stay in Stateville's F-House did not implicate a liberty interest despite the fact that the inmate had no access to cleaning supplies, trash was not removed, toilets were dirty and only periodically flushed, "little black bugs" were found around the toilet, and inmates were subjected to roaches, spiders, and mice. *See also Stallings v. Best*, 2018 WL 4300488, at *6 (N.D. Ill. Sept. 10, 2018) (finding no liberty interest for six-month confinement in F-House despite "six-legged pests that invaded [plaintiff's] food trays and body and four-legged pests that skittered over him in the dark"); *Coleman v. Baldwin*, 2016 WL 537970, at *4 (N.D. Ill. Feb. 11, 2016) (stating that no constitutional concern arose when an inmate was held for six months in "the presence of insects, mice, and broken windows as well as a restriction on showers and the deprivation of his wheelchair and walking cane").

Moreover, Santiago has not shown that the conditions he encountered during his 28-day stay in F-House were significantly atypical of his life outside the segregation unit. He claims in broad terms that F-House was different from other housing for Stateville's general population, but Santiago fails to cite anything in his Local Rule 56.1 submissions to support that claim. ([ECF No. 164], at 5). Defendants state that the noise levels were "about the same" in F-House and other

parts of Stateville. (Defs.' SOF No. 29). Santiago points to his deposition testimony describing the noise levels of F-House, but that testimony does not compare the noise in F-House with noise levels in the general population. ([ECF No. 165], Ex. 7 at 95-98). Santiago did testify that F-House involved greater levels of violence between inmates than what ordinarily was found in the prison's general population. He does not claim, however, that he was subjected to any violence during his disciplinary segregation. (*Id.*). Thus, Santiago has not shown that his stay in F-House was sufficiently long to give rise to a liberty interest, that the combination of his segregation and the conditions of F-House did so, or that he experienced conditions in F-House that were so atypical of those experienced by the general population that they implicate his Fourteenth Amendment rights. Summary judgment, therefore, is granted for Defendants on this issue.

### 2. Due Process

The Second Amended Complaint also alleges that Defendants Franklin and Wright, who were the members of the Adjustment Committee, violated Santiago's Fourteenth Amendment due process rights when (1) Wright denied Santiago's request that he recuse himself from the hearing due to a conflict of interest, (2) neither Defendant read the materials Santiago brought to the hearing, and (3) Defendants did not permit Santiago to speak in his own defense. ([ECF No. 28], at 9). "In the prison disciplinary context, due process requires only that the prisoner receive advance written notice of the charges, . . . an opportunity to present testimony and documentary evidence to an impartial decision-maker, . . . and a written explanation for the discipline." *Piggie v. Cotton*, 344 F.3d 675, 677 (7th Cir. 2003) (citations omitted); *see also Scruggs v. Jordon*, 435 F. Supp.2d 869, 876 (N.D. Ind. 2006) ("It is clear that prisoners have a due process right to an impartial decision maker.") (citation omitted). This is a lenient standard that requires no more than "a modicum of evidence." *Webb v. Anderson*, 224 F.3d 649, 652 (7th Cir. 2000).

All parties agree that the rights and obligations associated with the Adjustment Committee's proceedings are governed by department rule ("DR") 504, which tracks the requirements set out in the Illinois Administrative Code. 20 Ill. Admin. Code § 504. *See Ashley v. Snyder*, 316 Ill.App.3d 1252, 1258, 739 N.E.2d 897 (2000) (stating that the Illinois Administrative Code "creates no more rights for inmates than those which are constitutionally required") (emphasis omitted). A prisoner has the right to an impartial hearing, and §504.80(d) of DR 504 states that "[a]n offender who objects to a member of the Committee based on a lack of impartiality must raise the matter at the beginning of the hearing." ([ECF No. 150], at Ex. C). Santiago testified that he "immediately voiced an objection to [Wright] presiding over the matter" when he appeared at the hearing because Santiago previously had filed multiple grievances against Wright. ([ECF No. 165], Ex. 7 at 187-190). According to Santiago, Wright denied his request. (*Id.* at 193). By contrast, Defendants claim that Santiago could not have objected to Wright's participation in the Committee's hearing because the Adjustment Committee's report does not document that such an objection was raised. ([ECF No. 165], at Ex. 1). The Committee was required to document Santiago's objection because DR 504 states that "[t]he Committee shall document the basis of the [impartiality] objection and the decision in the Adjustment Committee summary." ([ECF No. 150], at Ex. C).

The Court disagrees with Defendants that the report's silence on Santiago's alleged objection necessarily means he did not make it. Defendants overlook that the same report also fails to include other information that is required by DR 504. Section 504.80(f)(1) of DR 504 allows inmates to make "any relevant statement or produce any relevant documents in his or her defense" at an Adjustment Committee hearing. ([ECF No. 150], Ex. C at Ex. 1). The Adjustment Committee then must include a written summary in its report "of oral and written statements and

other evidence presented." (*Id.*). As discussed below, it is undisputed that Santiago handed Wright what Wright described as a written "pamphlet" that Santiago claimed showed he legally was entitled to write the letter to Governor Quinn. ([ECF No. 165], Ex. 5 at 56, 57 ("Q: Did you see the pamphlet? A: Yes. He showed me the pamphlet.")). Like Santiago's alleged recusal request, however, the Committee's report does not record this evidentiary submission. Defendants cannot claim that the Committee's report is definitive evidence that Santiago did not object to Wright's participation in the hearing. As other courts have noted, "[t]he absence of evidence is not evidence of absence." *U.S. ex. rel. Birdo v. Pfister,* 2013 WL 6514100, at *16 (N.D. Ill. Dec. 12, 2013); *U.S. v. Harris,* 2009 WL 3055331, at *3 (N.D. Ill. Sept. 21, 2009).

The parties also present differing accounts of the events related to Santiago's remaining Fourteenth Amendment claims that Wright and Franklin failed to review the evidence Santiago brought to the hearing and refused to allow him to speak in his own defense. Santiago testified he sent a hand-written letter to the Adjustment Committee with two federal court cases attached to it. ([ECF No. 165], Ex. 7 at 195-96). The letter is attached as Exhibit E to Wright's deposition transcript without the court cases, but the letter identifies one of them as the Northern District of Illinois case of "*Moore v. Miller.*" The letter further states that *Moore* stands for the proposition that the inmate/plaintiff in that case had the right to send a provocative letter from the prison to the "Ron Goldman Trust." ([ECF No. 165], Ex. 5 at Ex. E). Neither party has identified the case, but the Court notes the decision in *Moore v. Miller*, No. 1997 WL 269595 (N.D. Ill. May 12, 1997) (finding that an inmate had a First Amendment right to mail an offensive letter to the Ron Goldman Defense Fund in the absence of a rule prohibiting it). Santiago testified that Wright told him the Committee had not received Santiago's letter. ([ECF No. 165], Ex. 7 at 196). Santiago claims that he then attempted to read a copy of his written statement but was cut off by Wright after only

a few statements. He then tried to read from the *Moore* case but again was silenced when Wright allegedly stated, "I don't care what any court has to say." (*Id.*).

Wright presents a different account of what took place, one that is not entirely consistent. He testified that Santiago presented him with a "pamphlet," which Wright variously described as "some court case" and as "a trifold piece of paper," apparently referring to Santiago's hand-written letter. ([ECF No. 150], at 56). Wright stated at one point that Santiago "either read it [or] he showed – he pointed it out to myself and Counselor Franklin." (*Id.* at 57). When he was shown the letter at his deposition, however, Wright stated that he had never seen it before and could not recall if Santiago had "said these same words" at the hearing. (*Id.* at 56, 58). Wright did not testify that he ever reviewed the documents that Santiago tried to present in his defense, but he claimed that he and Santiago talked "in detail" about a court case whose name Wright could not recall. (*Id.* at 37).

Seen in the light most favorable to Santiago, a fact finder could choose to credit Santiago's version of these events. Defendants have not presented any evidence suggesting that Wright or Franklin reviewed Santiago's written submission. In fact, Wright instructed Santiago to mail him a copy of his materials, which arguably would have been pointless had he read what Santiago tried to submit at the hearing. ([ECF No. 165], Ex. 5 at 57). Defendants cite Franklin's deposition testimony and claim that Santiago was allowed to read his evidence to the Committee. But Franklin stated that she did not recall Santiago bringing any papers to the hearing. ([ECF No. 150], Ex. E at 25-26, 30). Nor could she identify Exhibit E or remember if *Moore* had been discussed. (*Id.* at 30-31). Wright himself was unclear whether Santiago showed the material to him or actually read from it. As noted above, moreover, the Committee's report does not state that Santiago submitted any evidence or written materials. In light of the credibility determinations

that must be made to decide these issues, summary judgment is not appropriate on the remaining Fourteenth Amendment issues. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.").

## C.    The Eighth Amendment Issue

The Eighth Amendment forbids deliberate indifference to an inmate's health and safety, and a failure to take reasonable steps to mitigate a substantial risk of serious harm violates its terms. *Farmer v. Brennan*, 511 U.S. 825, 845 (1994). An Eighth Amendment claim comprises two prongs. First, "the deprivation alleged must be, objectively, sufficiently serious." *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999) (internal quotes and citation omitted). This objective component of an Eighth Amendment claim requires that the inmate must have experienced "extreme deprivations." *Id.* (citation omitted). *See also Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997) (stating that prison conditions may be "harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment"). Second, a defendant must have acted with deliberate indifference towards the conditions that meet this standard, *Board v. Farnham*, 394 F.3d 469, 479-80 (7th Cir. 2005), which requires a defendant to have had "subjective awareness" of the conditions. *Riccardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004). That involves "more than negligence and approaches intentional wrongdoing." *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006) (internal quote and citation omitted). *See Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 2006) (describing the inquiry as whether defendants "actually knew about [plaintiff's] condition, not whether a reasonable official should have known"). "[A] plaintiff must establish that the official knew of the risk (or a high probability of the risk) and did nothing." *Pope*

*v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996); *Davis v. Williams*, 216 F. Supp. 3d 900, 905 (N.D. Ill. 2016).

Santiago alleges that Warden Williams, Wright, Franklin, C. Williams, and Reed violated his Eighth Amendment rights when he was transferred to F-House and was subjected to excessive cold because of a broken window, cold water, mold, filthy mattresses, dirty bedding, unsanitary conditions, roaches and mice that crawled on him during the night, and vermin-infested food. Santiago claims these conditions caused extreme sleep deprivation, headaches, anxiety, depression, hunger pain, and significant weight loss. ([ECF No. 28], at ¶¶ 52-54; [ECF No. 165], Ex. A at 3). Defendants' Motion seeks summary judgment for Warden Williams, Wright, and Franklin; the Motion does not address Santiago's allegations against Defendants Reed and C. Williams.

### 1.    Defendants Franklin and Wright

Defendants argue that Wright and Franklin cannot be liable under the Eighth Amendment because they were not personally involved in any of Santiago's conditions of confinement at F-House. *See Sanville*, 266 F.3d at 740 ("[T]o be personally liable, a defendant must be personally responsible for the deprivation of a constitutional right.") (internal quote and citation omitted). That addresses the second prong of an Eighth Amendment claim concerning the subjective intent of a defendant. Defendants do not argue that the environment Santiago describes at F-House falls short of the standard required for an Eighth Amendment claim. To do so concerning Santiago's allegation of pest infestation, for example, Defendants would have needed to address "how extensive the infestation of a prisoner's cell is, what the infesting pests are, what odors or bites or risk of disease they create, what particular psychological sensitivities the prisoner was known to have . . . and how long the infestation continues." *Thomas v. Illinois*, 697 F.3d 612, 614-15 (7th

Cir. 2012). Similar discussions concerning Santiago's remaining allegations concerning dirty bedding and filthy conditions also would be required. The Court construes Defendants' silence on these issues as a concession that Santiago has met the first prong of his Eighth Amendment claim for the purpose of the pending Motion.

The Court agrees that Santiago has not met the second prong of the deliberate indifference standard as it concerns Defendants Wright and Franklin. Neither Wright nor Franklin worked at F-House while Santiago was placed there, and he never informed them about his environment. It is true, as Santiago states, that both Defendants formerly had been assigned to F-House. Franklin testified that she worked as a counselor at F-House for a six-month period in the "early 2000s" and was familiar with the inmates' cells at that time. ([ECF No. 164], Ex 6 at 41-43). Wright testified that he had been assigned to F-House for a one-year period at an unspecified time around 2008; that he had been "in and out" of the segregation unit since then on a monthly basis; and that he was familiar with F-House. ([ECF No. 164], Ex. 5 at 87-89). That does not mean, however, that Wright and Franklin had any knowledge of the conditions that Santiago claims he endured. Santiago does not describe the conditions of F-House when these Defendants worked there, nor does he allege that they were the same conditions that he encountered. Santiago appears to argue that Franklin and Wright should have inferred to what he was subjected based on their experiences at F-House years earlier. However, that is insufficient to demonstrate deliberate indifference. "It is not enough that a reasonable prison official would or should have known that the prisoner was at risk; the official must *actually know* of and disregard the risk to incur culpability." *Lewis v. Richards*, 107 F.3d 549, 552-53 (7th Cir. 1997) (citation omitted) (emphasis added). Nothing supports such a finding here based on the record evidence.

Even if Wright and Franklin knew of the conditions under which Santiago was confined, Santiago also must show they "acted or failed to act despite [their] knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 825. To be liable for an Eighth Amendment violation, a prison official must be able "to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996); *see also Gentry*, 65 F.3d at 561 ("In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery."). That is, the officer must be able to take some action. Wright was a Correctional Lieutenant at the time of Santiago's allegations, and Franklin was a Correctional Counselor. (Defs.' SOF Nos. 5, 7). Nothing suggests that either Defendant had the authority to remedy the conditions in F-House. Indeed, Santiago does not address this matter at all. Accordingly, he has not demonstrated that an issue of material fact exists, and Defendants' Rule 56 Motion for Partial Summary Judgment is granted as it concerns Wright and Franklin on the Eighth Amendment claim.

### 2.    Defendant Warden Williams

Unlike their arguments for Wright and Franklin, Defendants do not contend in their Motion that Warden Williams was not personally involved in the conditions at F-House, or that he was unaware of them. ([ECF No. 166], at 4-6). Nor does Defendants' Statement of Facts make that claim. (Defs.' SOF Nos. 45-47). Defendants argue instead that Warden Williams was proactive in trying to remedy the deficiencies at F-House that Santiago described. Stateville, for example, contracted with "Critter Ridder, Inc." to provide pest control; the Assistant Warden of Operations monitored and reported on conditions each month to Warden Williams; and the Chief Engineer kept F-House "at a certain temperature" during the winter. (Defs.' SOF Nos. 45-46; [ECF No. 149], at 12). In other words, Warden Williams argues that he was aware of the conditions at F-

24

House, at least to some degree, but his remedial efforts show that he was not deliberately indifferent to them. Defendants' reply brief charts a different course. The reply does not address Warden Williams's efforts to ensure that F-House's conditions were adequate; rather, it cites a variety of case authorities for the general propositions that an officer must be personally responsible for the deprivation of a constitutional right, and that the deprivation must have occurred with the officer's knowledge and consent. ([ECF No. 166], at 4-5).

Prison conditions have been litigated extensively in this District in relation to Eighth and Fourteenth Amendment claims. *See, e.g., Davis v. Williams*, 216 F. Supp.3d at 905-910 (citing multiple cases). The cases underscore the common-sense notion that demonstrating an official's subjective intent is fact-intensive. Defendants in this case have presented very few facts from which the Court can infer their subjective intent. In opposition to Defendants' Motion, Santiago has contested much of what Defendants have asserted, and the facts put forth by Defendants do not support fully their argument that Warden Williams was not deliberately indifferent to the conditions to which Santiago was subjected in F-House as a matter of law.

Defendants claim, for instance, that the Chief Engineer maintained a "certain temperature" at F-House, though they do not state what that was. (Defs.' SOF No. 46). Santiago counters that windows at F-House were broken and allowed cold air to enter. In support, he has submitted Safety and Sanitation Reports showing that windows in F-House needed repair for most of the time he was in F-House. And despite Defendants' reliance on the fact that "Critter Ridder" was hired to control pests, Santiago's sanitation reports show that pest control at F-House was deemed to be "unsatisfactory" by prison officials when Santiago was there. ([ECF No. 165], at Ex. 12).

The sanitation report for F-House that is attached to Warden Williams's own affidavit for the month of January 2015, three months after Santiago's stay in segregation, say, "[t]he area is

not free of insects, rodents, birds or other animals." [ECF No. 150-7, Ex. G, at Attachment 3]. The report also says, "[h]ot water is not available in the restroom facilities [and] [t]he shower areas are not clean and free of scum." *Id.* A February 5, 2015 memorandum attached to Warden Williams's affidavit says, "on all galleries windows needs [sic] to be repaired [and] work orders have been submitted." [ECF No. 150-7], Ex. G, at Attachment 4]. There is no indication in that memorandum of steps taken to address the persistent pest infestation that Critter Ridder apparently could not remediate. Nor is there anything to indicate Warden Williams was not aware that the deplorable conditions in F-House before, during, and after Santiago was housed there in segregation appear to have been chronic despite efforts that purportedly were being made to address them.

Warden Williams was not unaware of the conditions in F-House when Santiago was incarcerated there, but he maintains that his attempts to remedy the pest infestation and other unsafe and unsanitary conditions, even if those efforts were unsuccessful, insulate him as a matter of law from a claim that he was deliberately indifferent to them. The Court disagrees that it is as clear-cut as Warden Williams asserts. Courts in this Circuit have held that a jury should determine whether individuals in positions like that occupied by Warden Williams in this case took reasonable steps to address the adverse conditions in F-House sufficient to insulate them from liability. *See e.g., Gray v. Hardy*, 826 F.3d 1000, 1009 (7th Cir. 2016) ("Knowingly persisting in an approach that does not make a dent in the problem is evidence from which a jury could infer deliberate indifference."); *Bentz v. Hardy*, 638 Fed. Appx. 535, 538 (7th Cir. 2016) (finding that "depending upon that extent, duration and kind of infestation an inmate was made to endure, a trier of fact still may reasonably find an Eighth Amendment violation occurred even without a showing of physical harm") (citation omitted); *White v. Best*, 2018 WL 4679588, at * 8 (N.D. Ill. Sept. 28,

2018) (recognizing that the complained of conditions that the plaintiff allegedly endured while in segregation in F-House are "more systematic than localized" and therefore there is a basis "for the reasonable inference that Defendant (as the warden) knew about those systemic conditions"); *Brown v. Duvall*, 2016 WL 3125002, at *6 (N.D. Ill. June 3, 2016) (holding that a reasonable jury could find that "defendants' mere reliance upon a contractor's spraying . . . did not satisfy constitutional demands, particularly where the infestation continued").

On this record, the Court cannot conclude as a matter of law that Warden Williams has met his burden on summary judgment of showing the undisputed facts entitle him to judgment as a matter of law on Santiago's Eighth Amendment claim. Therefore, Defendants' Motion is denied as to Warden Williams on the Eighth Amendment claim against him.

### D. Continued Retaliation

In addition to its three numbered counts, the Second Amended Complaint also alleges in paragraphs 57-59 in an un-numbered "count" after Count Three that Defendant Rabideau has continued to retaliate against Santiago by placing him in cells with difficult inmates and that Warden Williams has known, or should have known, of Rabideau's behavior. ([ECF No. 28], at ¶¶ 57-59). Santiago does not identify what constitutional right these alleged actions have violated, but Defendants argue that no issue of material fact exists on either of Santiago's allegations. The Court agrees.

The Second Amended Complaint does not allege a basis for Santiago's allegations against Rabideau for retaliation. Insofar as Santiago claims that Rabideau continues to be motivated by the lawsuits and grievances discussed earlier in relation to Jovan Daniels' transfer, his claim of continuing retaliation fails for the same reasons as discussed above; Santiago has not identified what grievances and lawsuits Rabideau allegedly relied on to retaliate against him, and he has

27

presented no evidence to dispute her explanation of the procedures she used to determine which inmate should be assigned to Santiago's cell. As for Warden Williams, Santiago concedes the Warden generally was not involved with the placement of inmates at Stateville (Pl.'s Resp. to Defs.' SOF No. 41), and Santiago has not provided any evidence that would allow a reasonable juror to infer that Warden Williams should have known about Rabideau's decisions. Therefore, Defendants' Motion is granted on this issue.

### E. Compensatory Damages

Santiago seeks compensatory damages for the harms that allegedly stemmed from his stay in F-House, including extreme insomnia, cold temperatures, hunger pains, weight loss of 20 pounds, migraine headaches, anxiety, and depression. ([ECF No. 28], at ¶ 54). The Court reserved judgment on the issue of damages pending the resolution of Santiago's remaining claims. Defendants argue that Santiago is not entitled to any compensatory damages because the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), which controls the issue, provides that "[n]o Federal action may be brought by a prisoner . . . for mental or emotional injury suffered in custody without a prior showing of physical injury." *See Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003) ("We agree that, absent a showing of physical injury, § 1997e(e) would bar a prisoner's recovery of compensatory damages for mental and emotional injury.").

Citing *Pearson v. Welborn*, 471 F.3d 732 (7th Cir. 2006), Defendants argue that Santiago's loss of 20 pounds is not compensable because *Pearson* held that an inmate who lost 50 pounds due to emotional distress was not entitled to compensatory damages. *Id.* at 744. The Court agrees that an inmate cannot be compensated for weight loss that is caused by depression or anxiety. Although weight loss is a physical phenomenon that can be objectively measured, it is well established that physical manifestations of emotional distress are not compensable under the PLRA. *See Davis v.*

*District of Columbia*, 158 F.3d 1342, 1349 (D.C. Cir. 1998) (citing cases); *Murray v. Edwards County Sheriff's Dept.*, 453 F. Supp.2d 1280, 1292 (D. Kan. 2006) (noting that, without more, weight loss is insufficient to demonstrate physical injury under the PLRA). *Pearson* did not identify any cause for the weight loss in that case other than the inmate's depression and anxiety. *Pearson*, 471 F.3d at 744. That does not resolve the issue before this Court, however. Defendants exclusive reliance on *Pearson* raises two issues they do not address. First, Defendants have not argued, at least directly, that Santiago's weight loss was caused by emotional distress. Defendants clearly assume that is the case, and they cite Santiago's deposition testimony that he lost "at least 20 pounds" during his stay at F-House. (Defs.' SOF No. 48). But Santiago did not testify why he lost weight.

Second, the Second Amended Complaint lists a number of harms that Santiago alleges he suffered, including anxiety, depression, and weight loss. Santiago does not attribute his weight loss to anxiety or depression; he claims instead that all of his alleged injuries have a common cause – "the conditions in F-House." ([ECF No. 28], at ¶ 54). One of those conditions involved food that was inedible. Santiago testified in graphic detail that he was often given "horrific" food that he was unable to eat. ([ECF No. 164], Ex. 7 at 128). Santiago stated that food was served at F-House through a "chuckhole" in each cell that remained closed off to the inmates until a guard determined that all cells had been served. This could take up to an hour after the food had been placed in Santiago's chuckhole. He testified that at least 70 percent of the time, roaches and other insects were in his food by the time he was able to retrieve it. Santiago tried to eat food that was pre-packaged, though rats once chewed through the wrapping of cookies that he had saved. Roaches would get into any other food that remained in the cell, forcing Santiago to stop eating most of what he was served. (*Id.* at 121-31).

A juror reasonably could conclude that, if credited, Santiago's account of the food he was served at F-House was the cause of his weight loss. Citing *Pratt v. Corrections Corp. of Am.*, 124 Fed.Appx. 465 (8th Cir. 2005), Santiago argues that is sufficient for him to be awarded compensatory damages. In *Pratt*, an inmate alleged that he lost 30 pounds after he was denied meals that met his religious requirements and was offered nutritionally-deficient vegetarian food instead. The district court dismissed the inmate's claim on the ground that he had not suffered a physical injury, as required by the PLRA. The Eighth Circuit reversed that ruling, albeit with little or no discussion. *Id.* at 467. Defendants object that *Pratt* involved a Rule 12 dismissal of the inmate's claim, not the merits of his underlying allegations. *Pratt*, 124 Fed.Appx. at 467. Notwithstanding, *Pratt* suggests that under certain facts an inmate may be entitled to compensatory damages for weight loss that is caused by non-emotional reasons, and such harms can constitute more than a *de minimis* injury. Other courts have agreed that weight loss stemming from deficiencies in the food served to an inmate can constitute a physical injury for PLRA purposes. *See Shirley v. Sternal*, 2010 WL 602084, at *10 (S.D. Fla. Aug. 30, 2010) (citing cases). The Court does not conclude that Santiago has shown that his weight loss is compensable because it involves a physical injury. It only finds that Defendants have not carried their burden on a motion for summary judgment to show that Santiago's weight loss cannot be compensated as a matter of law.

Defendants shift grounds to some degree by also noting that in *Pearson* the inmate's only evidence of weight loss was his own testimony. *Id.* Defendants point out Santiago did not seek medical treatment after he left F-House, so no medical record exists to substantiate his claim. (Defs.' SOF Nos. 48-51). That does not mean, however, that no issue of material fact exists. Santiago claims that he knew he lost weight during his stay at F-House because he had to hold up

his pants by hand by the time he was released. He further claims that he did not ask to see a doctor because he would have been charged for the visit, and the request would have been "futile" in any event. (Pl.'s SOAF No 7). Certainly, Santiago will need to substantiate his allegation of weight loss in order to obtain compensatory damages. At this stage, however, the Court cannot decide the matter without making a credibility determination, which precludes entry of summary judgment on this issue.

Moreover, even if Santiago cannot demonstrate that he lost weight, Defendants overlook that Santiago alleges he suffered more than just weight loss during his stay at F-House. Santiago also claims that he experienced migraine headaches and hunger pains. ([ECF No. 28], at ¶ 54). Defendants do not argue that these do not constitute physical injuries, or that Santiago is not entitled to compensatory damages because they were caused by emotional distress. Some courts have found that the injuries Santiago alleges can be physical in nature and may entitle an inmate to compensatory damages. *See Walker v. Powell*, 2007 WL 4303766 (N.D. Fla. Dec. 10, 2007) (finding that a jury issue exists when insufficiently nutritious food is alleged to have caused headaches and stomach pain). Defendants' decision not to address all of Santiago's alleged harms leaves significant portions of his compensatory damages claim unchallenged. The Court, therefore, denies Defendants' Motion on this issue.

## IV.  CONCLUSION

For all the reasons stated in the Court's Memorandum Opinion and Order, Defendants' Rule 56 Motion for Partial Summary Judgment [ECF No. 148] is granted in part and denied in part.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated:  April 18, 2019